THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v
WARNER BOYD, Defendant-Respondent.

First Department, December 18, 1980

### APPEARANCES OF COUNSEL

*Hilary A. Hassler* of counsel *(Allen Alpert* with her on
the brief; *Robert M. Morgenthau, District Attorney,* at-
torney), for appellant.

*David B. Perlmutter* of counsel *(Sidney Offer,* attorney),
for defendant-respondent.

### OPINION OF THE COURT

FEIN, J.

Defendant and his companion, Larry Fay, were appre-
hended by police investigating an early morning armed
robbery of a subway token booth. Fay was discovered at
the time of apprehension to be carrying a gun. At the
police precinct defendant later revealed he too carried a

gun. Neither of the two was indicted for robbery. Thus, the sole issue before us is whether the police had probable cause to make the arrest leading to the discovery and seizure of defendant's weapon. Defendant and Fay were observed and apprehended on the deserted street in the early morning in the vicinity of a robbery by police officers acting on descriptions received over their radio and from the robbery victim.

At 4:30 on the morning of December 3, 1978, Police Officers Walsh and Iazzetti responded to a radio call of an armed robbery in progress at the IRT subway station at 135th Street and Lenox Avenue in Manhattan. The report described the perpetrators as two young black males with a gun, the shorter one wearing a black leather jacket and the other wearing a red jacket. Arriving at the scene within 3 to 4 minutes, the officers obtained a more precise description from the victim, the token booth operator, who stated he had been robbed at gunpoint. The one carrying the gun, the shorter of the two, wore a *brown* leather jacket with a fur collar over a gray sweatsuit. He had fired a shot at the token booth, whereupon the clerk had handed over a bag of money. The taller robber was wearing a red ski jacket. Both were "very young" black males, ages 14 to 16.

The officers immediately took to the street in search of the robbers, calling in this more detailed description over the police car radio. Proceeding north, they noted that Lenox Avenue was deserted, except for two young black males who were flagging a southbound gypsy taxicab at 140th Street. Officer Walsh thought they looked 14 to 16; Iazzetti thought 17 to 18, not 14 to 16. The shorter of the two was wearing a brown leather jacket with a fur collar, and the taller was wearing a blue ski jacket. The officers decided to follow the cab, proceeding south, reporting over their radio that they had two possible suspects under surveillance. When the cab stopped for a light at 135th Street, the officers jumped out of their car and removed defendant and his companion from the backseat at gunpoint and put them up against the cab trunk facing each other. Walsh frisked Fay and found a .32 calibre revolver in his waistband. As soon as Walsh found the gun he notified Iazzetti

who had just begun frisking defendant. At that point both suspects were handcuffed behind their backs and taken to the scene of the robbery for possible identification. The victim identified Fay, but hesitated with regard to defendant because he was wearing a blue jacket instead of a red one. Officer Sheehan, who had arrived to give backup assistance to Walsh and Iazzetti, told the victim: "Take your time and look carefully." After 45 seconds to a minute, the victim stated: "Yes, these were the two fellows."

Defendant and Fay were strip searched at central booking, at which time defendant alerted the police that he, too, was carrying a gun in his waistband. The sole indictment against defendant is based on possession of that weapon. Defendant and his companion were not indicted for robbery because of the inability of the token booth clerk to identify them at a lineup. The proceeds of the robbery were not found on either of the two.

The suppression Judge ruled:

"Accordingly, pursuant to 140.50 of the Criminal Procedure Law, the officers * * * had a right to stop the cab for the purpose of interrogating and frisking the defendant, whom they had reason to believe, at least one of whom may be armed.

"I find, however, that at the time of the initial observation, that the officers did not have probable cause to arrest the defendant, nor do I find it necessary, for the purpose of my ruling, to determine as to whether or not the defendant Boyd was properly subject to a frisk at the scene. I do not have to rule upon that as a matter of law, since the testimony is that no frisk was completed and no gun or contraband was found upon him at the scene.

"Since the officers did not have probable cause to arrest the defendant, but did have the right to frisk the defendant upon the seizure of the gun from the defendant Fay, the officer had the right to place the defendant under arrest, having probable cause, at that time, that the defendant had committed at least the crime of possession of a dangerous weapon.

"So far as the defendant Boyd is concerned, even after

the finding of a weapon on the defendant Fay, the officer had no right, solely by reason of the fact he was in the company of the defendant Fay, to arrest defendant, which arrest did take place, at least at that point, if not earlier.

"The officer would have the right to further interrogation. He did not further interrogate defendant Boyd, and therefore, the action of physically placing the defendant Boyd in handcuffs, taking him down into the subway station, booking him, were illegal actions on the part of the officer."

The suppression Judge went on to find that the subsequent recovery of the gun at the police station was tainted by the "illegal search and seizure". Accordingly, Boyd's motion to suppress was granted.

We disagree. There should be a reversal.

The implication of the court's determination was that defendant was seized and arrested solely because he was in the company of Fay. An arrest merely upon the basis that one is in the company of another suspected of committing a crime is unwarranted *(People v Martin,* 32 NY2d 123; *People v Batista,* 68 AD2d 515, affd 51 NY2d 996; *People v Trapier,* 47 AD2d 481). However, it ignores the realities, the totality of the circumstances, to find that Boyd was seized and arrested solely because he was in the company of Fay. "The proper determination in cases of this sort must necessarily turn on the facts in each individual case." *(People v Green,* 35 NY2d 193, 195.)

We deal first with the seizure, the stop and frisk. We must examine the predicate for the police action and then determine whether that predicate justified the extent of the police intrusion. *(People v Stewart, People v Williams,* 41 NY2d 65, 66). Plainly there were reasonable grounds upon which to stop the cab and remove its occupants and to subject them to a frisk. We do not deal with sparse information derived from an unknown informer of questionable accuracy and reliability. The source of the police information was the victim, and the information was given directly to the officers involved. "There is a difference of significant degree between a report only that a person has a gun in his possession and another report that a person

not only has a gun but that he has just used it for the commission of a crime." *(People v Green,* 35 NY2d, at p 196.)

Although the description of the perpetrators hurriedly taken by the officers from the token seller victim did not precisely match those of defendant and Fay, there were two good reasons for intercepting the two. First, they did generally conform to the description, and second, they were the only people on the street in the vicinity during the wee hours of this Sunday morning only minutes after the robbery *(People v Weis,* 32 AD2d 856). Under the circumstances, the police would have been remiss in allowing them to leave the vicinity without attempting to investigate their possible connection with this robbery. The precipitate act of a gunpoint stop was justified. The police were acting with knowledge that an armed robbery had just taken place *(People v Griffith,* 48 NY2d 1009, revg on dissenting opn of LUPIANO, J. 63 AD2d 138, 143-147). Under such circumstances, the police had the right, indeed the obligation, to investigate *(People v Stroller,* 42 NY2d 1052), and the right to check for weapons in order to permit them to proceed further with their investigation in safety *(People v McLaurin,* 43 NY2d 902, revg on dissenting opn of NUNEZ, J. 56 AD2d 80, 84-85).

The officers had reasonable grounds for the belief that the two had just committed a robbery while armed with a gun. Certainly they were justified in taking precautionary measures to insure their own safety and well-being. Fay fit the description given by the victim. Although the defendant was wearing a blue jacket and not a red jacket, he otherwise fit the limited description given by the token seller. "To hold that policemen, thrust into emergency situations where the difference between life and death is often measured in seconds, must isolate those persons whom they have probable cause to arrest from all bystanders before they can draw their guns is patently absurd." *(People v Chestnut,* 51 NY2d 14, 21.) There was at least the right to "stop and frisk" both defendants. The frisk obviously could not occur within the cab. Placing Boyd against the side of the cab to frisk him was warranted. "It would, indeed, be absurd to suggest that a police officer has to

await the glint of steel before he can act to preserve his safety." *(People v Benjamin,* 51 NY2d 267, 271.)

It is now settled that there is more than "one constitutionally acceptable manner of accomplishing a frisk" *(People v Chestnut,* 51 NY2d, at p 21, quoting 69 AD2d 41, 48). The officers could reasonably suspect that they were in danger of physical injury and that defendants posed a threat to the officers' safety. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *(Terry v Ohio,* 392 US 1, 27; accord *People v Chestnut, supra.)* The right to stop and frisk under the circumstances is clear.

While the frisk was proceeding one officer discovered a gun on the person of Fay. Coupled with the description which he fitted fairly precisely, this was sufficient to provide the officers with probable cause to believe that Fay was one of the two involved in the token booth robbery. Probable cause exists "if the facts and circumstances known to the arresting officer warrant a prudent man in believing that [an] offense has been committed" by the person to be arrested *(People v Oden,* 36 NY2d 382, 384; see, also, *Brinegar v United States,* 338 US 160, 175-176).

As the suppression Judge found, there was probable cause to arrest Fay. With respect to Boyd, the problem was different. He fit the description as the taller robber, except that his jacket was blue, not red. The officers had terminated the frisk of Boyd when the gun was found on Fay. Undoubtedly, had the frisk of Boyd continued, his gun would have been found, too. Perhaps on this basis we should find that the motion to suppress should have been denied and terminate our inquiry. Certainly a further frisk was warranted on the principles just stated. There was a danger that Boyd, too, was armed *(Adams v Williams,* 407 US 143, 145-146).

The officers were presented with a dilemma. They knew there had been two robbers. Plainly the police would have been remiss in their duties had they released Boyd at that point, without affording the victim an opportunity to identify him as one of the robbers. The gypsy cab had been

overtaken at the corner of 135th Street, which was precisely up the subway stairs from the scene of the robbery. This presented the police with an opportunity for a fresh and timely crime-scene identification by the victim who had had a good view of his assailants only moments earlier, a procedure which has been commended in *People v Blake* (35 NY2d 331). The immediacy of such a crime-scene showup, under much the same conditions as the victim had viewed his assailants only moments earlier, would determine whether Boyd was subject to arrest as one of the robbers. The alternatives were to take Boyd and Fay to the token booth or to summon the token seller to the street to view them (see *People v Figueroa*, 58 AD2d 655, 656). Defendant contends he should have been questioned at that point. To what avail does not appear.

"The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' *Terry v. Ohio*, 392 U.S. 1, 19" *(Pennsylvania v Mimms*, 434 US 106, 108-109).

It was reasonable for the police, under all the circumstances, to handcuff Boyd and Fay and take them downstairs to the token booth to ascertain whether they could be identified as the robbers, even though this procedure may have elevated the seizure into an arrest. Questioning defendant would have added nothing.

The predicate for the police action justified the extent of the intrusion *(People v Stewart*, 41 NY2d 65, *supra)*. The police possessed "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed the] intrusion" *(Terry v Ohio*, 392 US, at p 21). The Fourth Amendment was not affronted. There was probable cause for the police action.

One other troublesome point was the victim's hesitation before identifying defendant, and then only after some prompting by Officer Sheehan, due mainly to the victim's belief that the taller robber had been wearing a red jacket rather than a blue one. But the swift and decisive nature of the victim's identification of Fay, coupled with the somewhat more tenuous identification of defendant under cir-

cumstances in which this young-looking pair were the only pedestrians on the street within five blocks of the crime, gave the police cause for removing defendant and his companion to central booking as suspected robbers. Obviously at that point a search was warranted. Hence the fact that the defendant yielded the gun which he carried on his person just as the search was about to begin created no infirmity *(People v Chestnut, supra)*.

On the issues before us it is of no avail to defendant that neither he nor Fay was indicted for the robbery because the token seller could not identify either one upon a lineup. The issue on the gun charge turns upon the events as they appeared at the time of the search and seizure and the arrest. That the proceeds of the robbery were not found on either defendant is of no aid to Boyd either. Although it may well be that neither Boyd nor Fay participated in the robbery, that is not an element for consideration in testing the action of the police, albeit the subsequent failure of identification and the absence of the proceeds of the robbery emphasize the great care required in applying the constitutional standards applicable to identification, search and seizure, and arrest.

The order, Supreme Court, New York County (KLEIMAN, J.), entered August 31, 1979, suppressing physical evidence seized from defendant, and dismissing the indictment for criminal possession of a weapon in the third degree, should be reversed on the law, the motion to suppress denied, the dismissal of the indictment vacated and the action remanded to Supreme Court, New York County, for further proceedings.

BIRNS, J. P., MARKEWICH, LUPIANO and BLOOM, JJ., concur.

Order, Supreme Court, New York County, entered on August 31, 1979, reversed on the law, the motion to suppress denied, the dismissal of the indictment vacated and the action remanded to Supreme Court, New York County, for further proceedings.