OPINION OF THE COURT
Joseph A. Mazur, J.
The defendant in this case is charged with criminal possession of a weapon in the third degree.
A hearing was held before this court, pursuant to defen *706 dant’s motion to suppress physical evidence. Based upon the credible evidence adduced at the hearing, the court makes the following findings of fact and reaches the following conclusions of law:
On December 24, 1985, at approximately 2:30 a.m., Police Officer Erosa and his partner observed a vehicle with Massachusetts license plates make a right turn on a red light at Walton Avenue and 181st Street.
The officers stopped the vehicle, pursuant to the traffic violation they had observed. As they approached the vehicle, they saw Andre Jackson, who was seated in the rear of the vehicle put his hand into his coat pocket. The officers called out for him to keep his hands where they could see them. At that point, the car door opened and Jackson ran out, reaching his hand into the left side of his coat. After he had run approximately 15 feet, Jackson was stopped by Officer Erosa, who felt what appeared to be a gun in a holster. After removing what in fact was a gun from Jackson’s pocket, the officer brought him back to the car, where his partner had also recovered a gun from the driver of the vehicle.
Defendant, who had been sitting in the front passenger’s seat, was then ordered out of the car and frisked by Officer Erosa. A gun was recovered from defendant’s coat pocket at that time.
CONCLUSIONS OF LAW
The decision in this case turns solely on questions of the law of search and seizure, since the facts, as outlined above, are essentially not in dispute. Counsel have cited the two lines of cases arguably application to this matter, which makes the decision herein a close one.
The line of cases cited by defense counsel stand for the proposition that mere presence of an individual in proximity to others who are independently suspected of criminal activity does not give rise to probable cause to search that individual.
The authority relied upon by the District Attorney, on the other hand, are those cases which elucidate the special concerns involved where investigating officers confront possible weapon possession by the occupants of a vehicle.
In beginning its analysis, this court notes the recognized principle that the inference of guilt by association is impermissible. A person’s mere propinquity to others independently suspected of criminal activity does not, without more, give rise *707 to probable cause to search that person (Ybarra v Illinois, 444 US 85, 91; People v Martin, 32 NY2d 123; People v Batista, 68 AD2d 515).
The cases cited by defense counsel both demonstrate this proposition. In People v Ballejo (114 AD2d 902) the court held that the fact that defendant was in close proximity to a woman who had been seen hiding a cocaine-filled pouch and that defendant walked away with her did not permit the inference that he was suspect in criminal or narcotics-related activity for the purpose of justifying a search. In People v Batista (supra), no probable cause was found for the arrest of defendants who were placed under surveillance after leaving a novelty shop where they purchased holsters and were seized after an officer saw a gun in their companion’s hands, but they themselves had not engaged in any overt criminal activity.
Our appellate courts are clearly in agreement that one cannot be stopped or arrested for merely being in the company of another (People v Griffith, 63 AD2d 138, 142; People v Trapier, 47 AD2d 481, 483). In People v Martin (supra), the New York Court of Appeals stated that where the arresting officer did not see the defendant engage in any criminal activity and where the defendant was merely in the company of others who were engaged in a narcotics transaction, the conviction was reversed and the complaint dismissed. In People v Monsanto (73 AD2d 576, 577 [1st Dept 1979]), the court granted a motion to suppress and dismissed the indictment stating that: "Monsanto [the defendant] was not observed engaging in any overt criminal activity and was placed in custody merely for being in the vicinity of what the officers thought was the scene of a crime in progress. This mere presence in the area was insufficient to constitute probable cause to detain [him].”
After careful reading of the above-mentioned cases and others in this area, the court notes that the holdings cited must be analyzed in the factual contexts which gave rise to them. Almost without exception, these cases dealt with street encounters where the suspected crimes involved either narcotics transactions or passive weapons possession. In none of these cases was a possible threat to the officer’s safety seen as a factor in the court’s decisions.
In fact, in cases which involve street encounters, but which come to a different result from those cited above, the deter *708 mining factor appears to be such a perceived danger. In People v Jenkins (87 AD2d 526) the police were engaged in arresting a man whom they had more than probable cause to believe to be an armed bank robber in a high crime area. Defendant was the suspect’s sole companion and the police suspected that he may have been an accomplice. The court stated that: "Quite apart from that suspicion, in the circumstances of this case, the police had a right to assure their own safety during the arrest they were making and to prevent possible interference with the arrest. To that end they were justified in frisking the defendant (as well as the identified robber) to determine whether defendant was armed, and if armed, to disarm him. As it turned out, both men were armed with loaded pistols. In the exigent circumstances with which they were confronted, the police acted reasonably.” (Supra, at 526.)
In contrast to these factual settings outlined above, and the resulting legal conclusions, stands the line of cases dealing with vehicular stops and subsequent searches.
The factor of safety is clearly the key to this line of cases which the court finds to be most applicable to the question before it. Defendant in this case has not claimed that the investigatory stop of the motor vehicle was unlawful. It is well settled that a traffic violation (in this case, making a turn on a red light) may form the predicate for a police stop. (People v Ingle, 36 NY2d 413.) Defendant does argue, however, that the propriety of detaining an automobile passenger should be measured by the same standard used to determine the propriety of all intrusions on a citizen’s liberty of movement, that is, whether the officer possessed reasonable suspicion based on articulable facts to believe that the person was involved in criminal activity or posed a danger to the officer (Terry v Ohio, 392 US 1; People v Harrison, 57 NY2d 470; People v De Bour, 40 NY2d 210; People v Cantor, 36 NY2d 106). This perspective, however, comports with neither Federal nor State constitutional precepts. (People v McLaurin, 120 AD2d 270 [1st Dept].)
In holding that the occupants of a car legally stopped for a traffic violation may be ordered out of their vehicle as a protective measure, the courts have recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile, citing the significant percentage of murders of police officers which occurs when the officers are making traffic stops. For this reason, it has been established that police officers making stops of vehicles for traffic violations are entitled to order both driver and passenger out of the car. *709 (People v Livigni, 88 AD2d 386, affd 58 NY2d 894; People v David L., 56 NY2d 698; People v McLaurin, supra.)
Furthermore, it is well established that the expectations of privacy of a passenger in an automobile fall considerably below those of the occupant of a dwelling. Indeed, where a person has been found to be neither the operator nor owner of the car, he lacks standing to complain about the search of a car by the police.
Therefore, it is clear that had events proceeded as a mere traffic stop, in this case, the officers would have had the right to order all the occupants out of the vehicle. What is in question then, is the officer’s right to frisk defendant Branch. Evaluating police conduct, under the circumstances in this case, impels the application of the rational guidelines afforded by the Court of Appeals in an endeavor to properly evaluate police conduct in a given set of circumstances. As aptly stated in People v De Bour (40 NY2d, at 223): "We bear in mind that any inquiry into the propriety of police conduct must weigh the interference it entails against the precipitating and attending conditions. By this approach various intensities of police action are justifiable as the precipitating and attendant factors increase in weight and competence.”
While the situation confronting the officers in this case began as an ordinary traffic stop, events rapidly went several steps beyond such a routine stop.
As they approached the stopped car, they observed the back seat passenger reaching into his pocket. When they advised Jackson to keep his hands where they could see them, he ran out of the car with his hand still reaching into his coat pocket. Upon apprehending Jackson, the officers did indeed find a weapon. A gun was then recovered from the driver as well.
Defendant was seated in the front seat of the car at that time and concededly the officers had not observed him make any suspicious movements. Of course, it is also true that both officers were occupied with the car’s other occupants and had not been able to watch the defendant closely. It is this lack of observed actions by the defendant which causes his attorney to cite the "mere presence” line of cases discussed above. In this situation, however, the court feels that the officers had a legitimate legal basis to conduct a frisk of the defendant.
In this set of facts, the alternative to the action taken by the police would have been to leave the defendant sitting in the car with easy access to all areas of a vehicle from which *710 two armed people had just exited, while they attempted to complete the arrests of his companions. This course of behavior would have exposed the officers to inordinate risk. "According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile. Bristow, Police Officer Shootings — A Tactical Evaluation, 54 J. Crim. L. C. & P. S. (1963).” (Adams v Williams, 407 US 143, 148, n 3.)
It should be sufficient to note that "[t]here is no war between the Constitution and common sense” (Mapp v Ohio, 367 US 643, 657). Concerning the standards to be used in determining the existence of reasonable suspicion, the United States Supreme Court has ruled that such suspicion does not emanate from an antiseptic courtroom or a sterile library, nor is it a pristine philosophical concept existing in a vacuum. "[R]ather, it requires a pragmatic analysis of 'everyday life on which reasonable and prudent men, not legal technicians, act.’ * * * [and] is to be viewed from the vantage point of a prudent, reasonable, cautious police officer on the scene at the time of the arrest guided by his experience and training * * * It is * * * the totality of these facts and circumstances [confronting him] which is the relevant consideration * * * when viewed in unison the puzzle may fit.” (United States v Davis, 458 F2d 819, 821 [1972].)
In this case, the court finds that while defendant Branch’s actions may have been consistent with innocuous or innocent behavior, it would be unrealistic to require the officers, who knew that other gunmen were present and that defendant was associated with the individuals they were then placing under arrest, to assume that risk. It would, indeed, be absurd to suggest that a police officer must "await the glint of steel before he can act to preserve his safety” (People v Benjamin, 51 NY2d 267, 271). Considering the totality of the circumstances, there was an ample measure of reasonable suspicion necessary to justify the limited intrusion — a mere frisk— which produced the loaded firearm from defendant’s person.